**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CITROSUCO NORTH AMERICA, INC.,

      *Plaintiff*,

v.

ENERFAB, INC.,

      *Defendant*.

_____/

CASE NO. _____

**COMPLAINT**

Citrosuco North America, Inc. ("Citrosuco") sues Enerfab, Inc. ("Enerfab") and alleges as follows:

**NATURE OF THE ACTION**

1.      This is an action for damages stemming from Enerfab's failure to comply with its contractual obligations to Citrosuco and its failure to exercise the requisite degree of professional skill and care in managing and overseeing repairs to Citrosuco's aseptic storage tank in Lake Wales, Florida.

**THE PARTIES**

2.      Citrosuco is a Delaware corporation with its principal place of business located in Lake Wales, Florida. Founded in the early 1960s, Citrosuco is part of a family of companies that grow, process, and sell orange juice products, including packaged orange juice. The company stores the orange juice in massive aseptic tanks at Citrosuco's refrigerated facility in Lake Wales, including storing the juice for other manufacturers in exchange for storage fees.

3.      Enerfab is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Among other things, Enerfab is a fabrication, construction, and maintenance company that

builds aseptic storage tanks and provides "comprehensive coatings & linings solutions" for such tanks, including coating and lining application, corrosion prevention, quality assurance oversight, and project management services.[1]

### JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because the matter in controversy exceeds $75,000 exclusive of interest and costs, and is between citizens of different states.

5.      Personal jurisdiction exists under Florida's long-arm statute, section 48.193(1)(a), Florida Statutes, because Enerfab operates, conducts, and engages in the above-described business in this state, committed tortious acts within this state, and breached contractual obligations in this state by failing to perform acts required to be performed in this state, and this action arises from such conduct. Fla. Stat. §§ 48.193(1)(a) 1., 2., 7.

6.      The exercise of personal jurisdiction also comports with due process because Enerfab has sufficient minimum contacts with this state and has purposefully availed itself of the privilege of conducting activities in this state by, among other things, entering into contractual and consulting relationships centered in Florida, including the relationship at issue here, and this action arises out of, and relates to, Enerfab's contacts with this state.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Citrosuco's claims occurred in this district and the property at issue in this case is situated in this district.

---

[1] *See* ENERFAB.COM, https://enerfab.com/coatings-linings/ (last visited Sept. 23, 2021).

## THE TANK AND INITIAL BREAKDOWN

8.      In a refrigerated facility in Lake Wales, Florida, Citrosuco stores orange juice product in enormous tanks, holding nearly two million gallons of product each. The tanks are designed to store juice at a certain temperature under hygienic conditions as dictated by federal and state laws and regulations.

9.      The walls of the tanks are steel, but as orange juice is acidic and as unprotected steel will degrade over time rendering the juice unfit for consumption, the tanks are also lined with an inner epoxy-like liner, designed to be an impervious membrane separating the juice and steel.

10.     When in use, the tank (among other things) is rented to other juice distributors at an annual rate of approximately $800,000.00 per year (over $65,000.00 per month).

11.     In early April 2020, while being cleaned and serviced, one of the four tanks in one of the rooms of the facility (tank 4A) became over-pressurized and failed, deforming the tank's roof, collapsing a portion of its steel wall, and tearing the tank's inner lining, among other damage.

12.     Enerfab built the tank in question in 2010.

## THE REPAIR PROJECT

13.     Because Enerfab built the tank, Citrosuco contacted Enerfab to evaluate the damage and work with Citrosuco's equipment breakdown insurer – Liberty Mutual – in developing the repair protocols and pricing.

14.     Liberty Mutual initially paid Enerfab $250,000 (of which Citrosuco paid a $50,000 deductible) to prepare the repair protocol, including specifications for the work.

15.     Extensive investigations ensued as to the method to repair the tank and negotiations between Citrosuco and Enerfab regarding repair protocols and budgets. Enerfab's Vice President represented that Enerfab had experience working with insurance companies on previous projects.

16.     On or around July 24, 2020, Citrosuco and Enerfab entered into a written agreement to make repairs to the tank in accordance with Enerfab's recommendations (the "Agreement"). A copy of the Agreement is attached as **Exhibit A**.

17.     In the course of performance of the Agreement, Enerfab agreed to and did assume total responsibility for the work, including oversight, management, and supervision of the work, as discussed below.

18.     For example, on August 26, 2020, Enerfab prepared and provided Citrosuco with an evaluation report making various recommendations and expressly agreeing that "Enerfab will . . . remove and re-line tank interior," among other services, such as removing the existing top head and providing scaffold access.

19.     Enerfab then emailed Citrosuco in September 2020 stating that, "[d]ue to warranty issues, we'll need [Citrosuco] to issue a contract direct to the lining subcontractor to avoid Enerfab being responsible for the 2 year warranty."

20.     In the same email, however, Enerfab confirmed that it "will manage/coordinate" and "have a 3rd party NACE consultant to monitor quality."

21.     Indeed, in November 2020, Enerfab emailed Citrosuco's broker revising its budget to include a "20% markup" for "management and coordination" of the lining subcontractor. And, Enerfab billed and collected that markup from Citrosuco.

22.     For its part, Citrosuco emailed Enerfab in November 2020 making clear that it "need[s] Enerfab on top of this process, monitoring [the lining subcontractor] and approving their job (work timeline, safety, and quality of service) on behalf of Citrosuco. We are counting on Enerfab as expert to this process supporting Citrosuco."

23.     Acting as the project manager and engineering consultant, Enerfab sourced needed

materials for the repair, including, but not limited to, the new liner to be applied inside the tank, scaffolding for the interior re-lining work, and a temporary wall built to ensure continued cooling of adjacent tanks during the repairs.

24.     And as mentioned, Enerfab directed and arranged for Citrosuco to contract with a third-party contractor, Universal Blastco ("UB"), to remove the damaged liner via high-pressure water blasting and apply a new tank liner (the "UB Agreement"). A copy of the UB Agreement, dated February 11, 2021, is attached as **Exhibit B**.

25.     Enerfab itself drafted the UB Agreement and specifications, which acknowledged that the purpose of the specification was "to provide reliable corrosion protection to painted steel surfaces named herein." *See* UB Agreement at Ex. 1 ¶ 1.2.

26.     There are two methods available for removing the old liner, which is bonded with the steel tank wall. One method involves blasting the tank wall under high pressure with a sand-like substance, which abrades the old liner until removed. The second method requires water-blasting under very high pressure to achieve the same end. The former is difficult (removing the grit is time consuming and labor-intensive) and thus more expensive. In any event, the mechanism Enerfab would use to "sand-blast" was unavailable due to an issue on another Enerfab project.

27.     Ultimately, Enerfab recommended the use of water blasting over sand blasting for the project. Relying on Enerfab's expertise and recommendation, Citrosuco and ultimately Liberty Mutual agreed to a repair protocol that would remove the interior liner via ultra-high pressure water blasting.

### CRYSTALLINE-LIKE STRUCTURES BEGIN TO FORM ON THE STEEL

28.     Work began in November 2020 and continued until late February 2021, when dark spots appeared on the raw steel inside the tank just after the old liner was removed using the water

blasting process, preventing application of the new liner. The same crystalline-like structure started to forms on the tank walls and also on the new "top head" replaced by Enerfab a few weeks earlier in February.

29.     The work stopped as Liberty Mutual and Enerfab engaged consultants and chemists to inspect, sample, and test the condition of the tank.

30.     After discovering the crystalline-like residue that had begun to form on the steel, Enerfab emailed Liberty explaining the relining process and why a "water blast" was used "in lieu of dry blast," which Enerfab described as "cleanliness and efficiency" reasons. In that same email, Enerfab explained that "[d]uring final lining preparation and inspection, crystalline-like structures began to form on the surface of the bare steel, uniform across the entire surface," and noted that, after taking samples, Enerfab "began the process to test areas on the tank with various methods of removal to develop an action plan for the most effective and efficient method of removal."

31.     After months-long delays by Liberty Mutual in investigating this issue, Citrosuco engaged E&S Consulting, Inc. ("E&S"), a metallurgical expert, to inspect the tank and analyze the residue. Based on its inspection, E&S found that "the use of water by Enerfab/Universal Blastco to remove the original liner by UHP [ultra-high pressure] was the direct and only cause for the thin layer of iron oxide (rust) to form all over the inside of the tank." *See* May 21, 2021 E&S Report, attached as **Exhibit C**, at 2.

32.     In addition, a report issued by a consultant engaged by Citrosuco's property insurer, Sedgwick, found that Enerfab failed to properly isolate the tank from the outdoor environment, leading to a condition where "water will condensate on surfaces which has a temperature below the warm airs dew point," and also found that the old liner was hydro blasted without mitigating the humidity issues within the tank, causing the process of oxidation to start on the walls. *See* June

24, 2021 Halliwell Report, attached as **Exhibit D**, at 4.

33.     In addition, an engineering report obtained by Liberty Mutual concluded that the spotting was rust, and was caused by "atmospheric corrosion," which the report explained "can occur on surfaces that appear nominally dry." According to the report, "[i]ncomplete drying or capillary condensation can result in microscopic droplets of water in micro asperities" and "[w]hen combined with certain corrosive anions this can cause rapid, localized corrosion resulting in the formation of rust spots on steel." *See* April 6, 2021 J.S. Held Report, attached without voluminous appendices as **Exhibit E**, at 12.

### ENERFAB RECORDS A CLAIM OF LIEN AGAINST THE PROPERTY

34.     Despite the three separate reports finding Enerfab at fault for the oxidation inside the tank and the resulting delay-related costs incurred during the investigation (not to mention the damages Citrosuco has incurred and will continue to incur to remedy the issue), Enerfab recorded a lien against Citrosuco's facility, claiming that Citrosuco owes Enerfab approximately $646,000 for additional invoices billed after the oxidation issue was discovered (the "Claim of Lien"). A copy of the Claim of Lien is attached as **Exhibit F**.

35.     Liberty should pay any outstanding amounts owed to Enerfab as part of the covered repairs, which is a separate dispute between Citrosuco and Liberty.

36.     However, numerous issues exist with Enerfab's lien that render it unenforceable in any event.

37.     First, on May 28, 2021, Liberty Mutual informed Citrosuco that Enerfab's invoices contained "duplications" and "excessive tax calculations (e.g., as much as 35 percent)," ostensibly rendering the lien a fraudulent lien under Fla. Stat. § 713.31(2). Liberty reached out to Enerfab to clarify the excessive charges, but Enerfab refused to explain its duplications.

38.     Second, to the extent Enerfab seeks to collect charges, including those for scaffold rental or other equipment caused by Enerfab or any charges to remove the corrosion, those charges are uncollectible to the extent billed by Enerfab or should be paid by Enerfab itself.

39.     Third, Enerfab violated the dispute resolution provisions under the Agreement by recording the lien without first attempting to resolve the issue in good faith. *See* Agreement ¶ IV.

40.     Last, even if Enerfab's lien were enforceable (it isn't), the amounts claimed must be set off against Citrosuco's own damages, which are believed to exceed any additional money purportedly owed to Enerfab.

41.     Citrosuco hoped to mitigate its loss by completing the tank repairs, which requires an adequate quantity of the Munkadur liner material. Munkadur liner is the material to be applied on the steel interior of the tank and serves as the sanitary barrier to protect the juice quality.

42.     Citrosuco previously paid for what Enerfab represented to be an adequate quantity. Citrosuco has since learned, however, that Enerfab misstated the amount of liner material needed for the job.

43.     To the best of Citrosuco's knowledge, Enerfab is the only available source for the Munkadur liner.

44.     But when Citrosuco (through UB) asked to purchase additional amounts of the liner so that the work could finally be completed, Enerfab refused.

45.     Enerfab's effective monopoly is now being used to leverage and extort additional payments from Citrosuco.

46.     As a result, the repair project and Citrosuco's continued effort to mitigate its loss has again been stopped in its tracks.

47.     Citrosuco has complied with all conditions precedent to bringing this action or such

conditions have been waived or excused.

48. Citrosuco has retained counsel to represent it in this action, and has agreed to pay a reasonable fee for services rendered.

## COUNT I
### BREACH OF CONTRACT

49. Citrosuco re-alleges paragraphs 1 through 48.

50. Citrosuco and Enerfab entered into a valid contract requiring Enerfab to make repairs to Citrosuco's tank, including the removal of the interior liner.

51. Furthermore, based on the subsequent oral and/or implied agreement of the parties, including through their course of performance of the original written Agreement, Enerfab agreed to supervise, manage, and coordinate the blasting and re-lining work to ensure, among other things, that the work was performed in a manner that would prevent corrosion to the steel tank during the repair project. Enerfab's conduct was intentional, and Enerfab knew or, under the circumstances, should have known that Citrosuco would understand Enerfab's conduct and representations as creating additional contractual obligations.

52. Enerfab materially breached its contractual obligations to Citrosuco by failing to adequately manage, supervise, and otherwise oversee the work to prevent the suspected corrosion from forming on the tank during the repair process.

53. As a direct and proximate result of Enerfab's breaches of contract, Citrosuco has and will continue to suffer damages, including, but not limited to:

    a. further damage to Citrosuco's tank;

    b. costs that Citrosuco has incurred and will incur to complete the repairs at its own expense, including costs for scaffolding rental and further repair work to remove and repair the crystalline residue damage and complete the repairs;

    c.   delay damages and lost profits that Citrosuco would have received from storage fees had the tank been placed back into service as contemplated by the contract, which can be established with reasonable certainty;

    d.   alternatively, in the event the tank cannot be repaired, the diminution in value of the tank based on the difference in value between a viable and usable tank warranted as agreed and the tank in its present condition;

    e.   legal fees and costs incurred by Citrosuco in negotiating with and resolving issues with UB and BrandSafway under the wrongful act doctrine; and

    f.   any other damages that may be proven at trial.

## COUNT II
## PROFESSIONAL NEGLIGENCE

54.    Citrosuco re-alleges paragraphs 1 through 48.

55.    As a professional engineering firm hired and relied upon to develop and implement the repair protocol for the tank repairs, and manage and coordinate the repairs to prevent corrosion from forming on the tank as a result of the water-blasting method that Enerfab recommended, specified, and implemented, Enerfab was required to exercise the same degree of skill and care as a reasonably prudent engineer would use under like circumstances.

56.    Among other things, Enerfab was required to exercise the requisite degree of skill and care to ensure that the repairs were performed without causing further damage to Citrosuco's tank, including damage associated with the "crystalline-like structures" that formed during the repair process.

57.    Enerfab breached its duty of care to Citrosuco by failing to use the requisite degree of skill and care to ensure that the water-blasting and drying was performed in a manner and under conditions that would avoid the formation of the "crystalline-like structures" on the tank, further

damaging Citrosuco's property.

58.     As a direct and proximate result of Enerfab's failure to act with the requisite degree of skill and care, which produced or substantially contributed to producing the damage associated with the crystalline-like structures, Citrosuco has and will continue to suffer damages, including, but not limited to those alleged in paragraph 53, above.

### COUNT III
### FRAUDULENT LIEN

59.     Citrosuco re-alleges paragraphs 1 through 48.

60.     This is an action for damages and declaratory relief finding Enerfab's Claim of Lien unenforceable pursuant to Fla. Stat. § 713.31.

61.     Enerfab's Claim of Lien is a fraudulent lien under § 713.31(2)(a), because Enerfab willfully exaggerated the amounts purportedly owed in its Claim of Lien, willfully included a claim for work not performed or materials not furnished, and at minimum, compiled its claim with such willful and gross negligence as to amount to a willful exaggeration.

62.     Enerfab did so by (among other things) seeking amounts based on unsupported and excessive invoices; amounts for work and services not actually performed, but rather for additional time (and travel time) that Enerfab spent at the facility doing nothing during the project delay that Enerfab itself caused; and exorbitant and unlawful taxes on labor, materials, and even travel time (as much as 33%).

63.     As a direct and proximate result of Enerfab's Claim of Lien, Citrosuco has suffered damages in an amount to be proven at trial and Citrosuco's property has been subjected to a false and fraudulent encumbrance and cloud on title.

COUNT IV
<u>FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT</u>

64.     Citrosuco re-alleges paragraphs 1 through 48.

65.     This is an action for damages pursuant to the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201 *et seq.*

66.     Enerfab's fraudulent and extortionate conduct as alleged above is likely to deceive a consumer, including Citrosuco, acting reasonably in the same circumstances; Enerfab's conduct is therefore "deceptive" within the meaning of FDUTPA.

67.     Furthermore, given Enerfab's consulting relationship with Citrosuco, who relied on Enerfab's industry knowledge and market position in the supply and application of Munkadur liner on similar tanks, Enerfab's conduct is also unethical, oppressive, and unscrupulous or substantially injurious to consumers, and thus "unfair" within the meaning of FDUTPA.

68.     As a direct result of Enerfab's wrongful conduct, Citrosuco has suffered actual damages, including, but not limited to:

    a.  the difference in the market value of the tank in its current condition and the market value of the tank in the condition in which it should have been delivered according to the parties' contract, with the complete re-lining and warranty from Munkadur— or alternatively, if the tank has been rendered valueless, the purchase price of the tank and the amounts paid to Enerfab to repair and deliver a usable tank;

    b.  additional delay costs, including additional scaffold rental costs incurred as Enerfab refuses to provide the remaining liner needed to complete the repairs;

    c.  amounts paid to Enerfab on the basis of fraudulent or excessive invoices;

    d.  attorney's fees and costs; and

    e.  any other damages that may be proven at trial.

## PRAYER FOR RELIEF

Citrosuco demands judgment for damages against Enerfab, including actual damages and special consequential damages as alleged above, pre- and post-judgment interest, attorney's fees, costs, and prevailing party attorney's fees pursuant to paragraph IV of the Agreement and Florida law; and further demands judgment declaring the Claim of Lien unenforceable and, upon proper showing and motion, awarding punitive damages as provided under Fla. Stat. § 713.31(1)(c).

## JURY TRIAL DEMAND

Citrosuco demands a trial by jury in this matter.

Dated: October 13, 2021

Respectfully submitted,

**REED SMITH LLP**
1001 Brickell Bay Drive, 9th Floor
Miami, Florida 33131
Telephone: (786) 747-0200
Fax: (786) 747-0299

/s/ *R. Hugh Lumpkin*
**R. Hugh Lumpkin**
Florida Bar No. 308196
hlumpkin@reedsmith.com
bcastillo@reedsmith.com
**Edward M. Mullins**
Florida Bar No. 863920
emullins@reedsmith.com
bhernandez@reedsmith.com
**Garrett S. Nemeroff**
Florida Bar No. 111675
gnemeroff@reedsmith.com
iromero@reedsmith.com

*Counsel for Plaintiff*